UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| JOINT APPRENTICESHIP AND TRAINING COMMITTEE OF LOCAL UNION NO. 36, affiliated with INTERNATIONAL ASSOCIATION OF SHEET METAL, AIR, RAIL AND TRANSPORTATION WORKERS | ) ) ) ) ) ) | |
| | ) | |
| and | ) | No: 4:16 CV 1371 DDN |
| | ) | |
| INTERNATIONAL TRAINING INSTITUTE FOR THE SHEET METAL AND AIR CONDITIONING INDUSTRY, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MITCHELL L. WEDDLE, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND ORDER
REMANDING ACTION TO STATE COURT

Before the court are the motions of defendant to dismiss for failure to state a claim upon which relief can be granted (ECF No. 8) and of plaintiffs to remand the action to the Missouri circuit court (ECF No. 17).  The parties consented to the exercise of plenary authority over this action by the undersigned United States Magistrate Judge under 28 U.S.C. § 636(c).

The court heard oral argument on these motions on October 18, 2016.  For the reasons stated below, plaintiffs' motion to remand is sustained and defendant's motion to dismiss is deferred to the state court.

## I.  BACKGROUND

Plaintiff Joint Apprenticeship and Training Committee of Local Union No. 36 (JATC) is a joint labor management committee established under a union agreement between the St. Louis Chapter of the Sheet Metal Air Conditioning Contractors National Association and the International Association of Sheet Metal, Air, Rail and Transportation Workers (SMART).   The JATC operates certain training and apprenticeship programs.

On July 22, 1999, the Department of Labor's Bureau of Apprenticeship and Training approved JATC's proposed apprenticeship program standards.  (ECF No. 18, Ex. 4, at 13).  These standards included an addendum titled "Appendix A, Selection and Admission of Apprentices," which provides in part:

> The applicant should understand and agree that the local Joint Apprenticeship and Training Committee and National Training Fund will provide various work books, text books and other training materials and expend significant sums of money for the training of the Apprentice in the specialized skills necessary for employment in the Sheet Metal Industry; which will result in a substantial direct benefit, as well as substantial indirect and intangible benefits, to the Apprentice from this training which has significant value.  The applicant should further understand that these considerable expenditures will be repaid to the National Training Fund and the Local Joint Apprenticeship and Training Committee by the Apprentice working in the Sheet Metal Industry resulting in contributions being made to the National Training Fund and Local Joint Apprenticeship and Training Committee pursuant to Collective Bargaining Agreements.
>
> The Apprentice agrees that he or she will neither seek nor accept employment from an Employer engaged in, nor become an Employer engaged in, any general, mechanical sheet metal, testing and balancing, roofing, residential, sign or food service work or any other work covered by the Constitution of the Sheet Metal Workers' International Association unless such employment is performed under the terms of a Collective Bargaining Agreement that provides for the payment of contributions by such Employer to the National Training Fund or to the Local Joint Apprenticeship and Training Committee or to another Joint Apprenticeship and Training Committee sponsored by or affiliated with a local Union of the International Union.

> If the Apprentice breaches this Agreement, all amounts due and owing on the Scholarship Loan reduced by any credit received by the Apprentice, or any cash payments made, will become immediately due.

(*Id.*)

The apprenticeship programs are funded by the SMART Local 36 Apprenticeship and Training Fund (Local Fund) and the International Training Institute of the Sheet Metal and Air Conditioning Industry (ITI).  (ECF No. 18, Ex. 3, at 3).  ITI provides the training materials and curriculum for the apprenticeship program, while both ITI and the Local Fund pay any remaining expenses.  (*Id.* at ¶ 7).  Both the Local Fund and ITI have their own boards of trustees and trust agreements and are funded by contributions from signatory employers under the terms of collective bargaining agreements.  (*Id.*)  The JATC does not directly receive employer contributions.  (*Id.*).  The monies contributed by signatory employers to ITI and the Local Fund may only be used to train apprentices who will work for signatory employers.  (*Id.* at Ex. 6, at 2, § 3).  Accordingly, the scholarship loan program requires apprentices to repay the cost of any training they have received if they leave.  (*Id.*)  In exchange for the use of its materials and programs, ITI requires JATC to use the scholarship loan agreements.  (*Id.*) ("If a Local J.A.T.C. does not implement the Scholarship Loan Agreement, the Local J.A.T.C. shall be prohibited from utilizing International Training Institute materials and programs").

Defendant Mitchell L. Weddle was an apprentice in plaintiffs' apprenticeship training program.  Mr. Weddle entered into three such scholarship loan agreements with the JATC and the ITI to cover the costs of his apprenticeship training in the sheet metal industry.  He signed a separate agreement for each year of training.  (ECF Nos. 1-1 to 1-3).  These agreements provided in part that:

> The Apprentice understands and agrees that [plaintiffs] will provide various workbooks, textbooks and other written material . . . expend significant sums of money for educating and training the Apprentice in the specialized skills necessary for employment in the Sheet Metal Industry.  The Apprentice also understands and agrees that this training will result in a substantial direct benefit, as well as a substantial indirect and intangible benefit, to the Apprentice[.]

\*\*\*

The Apprentice further understands that these considerable expenditures will be repaid to [plaintiffs] by the Apprentice working in "Qualifying Employment" within the "Sheet Metal Industry" . . . which will result in contributions being made to [plaintiffs] pursuant to Collective Bargaining Agreements.

\*\*\*

The Scholarship Loan will be repaid by the Apprentice in full, either in cash or by in-kind credits[.] . . . An Apprentice who works in Qualifying Employment will receive a credit for each calendar year of Qualifying Employment[.]

\*\*\*

It will constitute an immediate breach of this Agreement if the Apprentice accepts or continues in "Disqualifying Employment." "Disqualifying Employment" is: (a) employment in the Sheet Metal Industry with an employer which does not have a Collective Bargaining Agreement . . . or (b) self-employment in the Sheet Metal Industry without having a Collective Bargaining Agreement[.]

(*Id.* at Ex. 1-1 at 10-11, 16-17).

[Plaintiffs] will expend significant sums of money for education and training necessary to enable [Weddle] to complete the [plaintiffs'] sponsored apprenticeship training program and/or education and training in certain advanced and/or specialized skills . . . . [Weddle] understands and agrees that receipt of this education and training . . . will result in a substantial direct benefit, as well as substantial indirect and intangible benefit, to [Weddle]. [Plaintiffs] agree that the amounts set out in Paragraph 1 below represent the costs to [plaintiffs] in providing education, training, and Training Materials and that the total of such amounts constitute a Loan to [Weddle] which, to the extent not forgiven pursuant to the terms of this agreement, is to be repaid in full with interest.

\*\*\*

It shall constitute an immediate breach of this Agreement and immediate payment of the amount of the loan outstanding (i.e. the Loan amount less amount forgiven) shall be required if Borrower accepts or continues in employment in the Sheet Metal Industry that does not constitute Qualifying Employment.

(*Id.* at 22-23).

Plaintiffs allege that Weddle failed to meet his obligations under the agreements. They allege that he left his apprenticeship training in April 2016, was terminated by his employer, refused a referral to another union employer, stated he did not want to return to the apprenticeship program, began working for a non-union employer in the sheet metal trade, and his status as an apprentice ended.  (ECF No. 18, Ex. 3, ¶ 9).

On July 12, 2016, plaintiffs brought suit in the Circuit Court of the City of St. Louis against defendant Weddle for breach of contract under Missouri law to recover $25,041.20.  (ECF No. 1-1 at 6-27).

Defendant removed the case to this court under 28 U.S.C. § 1441(a), asserting subject matter jurisdiction under 28 U.S.C. § 1331, alleging that plaintiffs' claim is completely preempted by the federal Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §1132.  (ECF No. 1 at 2).

## II.  PLAINTIFFS' MOTION TO REMAND

Plaintiffs timely move to remand this case, arguing that the court does not have subject matter jurisdiction over their breach of contract claim because it is not preempted by ERISA.  Defendants maintain that ERISA preemption applies to the claim such that it must remain in federal court and be dismissed for failure to state a permissible ERISA claim.

### a.  Legal Standard

A defendant may remove a case from state court to federal district court if the district court would have original jurisdiction over it.  *See* 28 U.S.C. § 1441(a).  A federal law "may so completely preempt a particular area" that any civil complaint in that area, however it might be pleaded, necessarily raises a federal question.  *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 63-64 (1987).  The Supreme Court has concluded that ERISA is such a law.  *See id.* at 63-67.  State law causes of action filed in state court that are preempted by ERISA are removable to federal district court.  *See id.* at 64-76.

As the party seeking removal, defendant has the burden to establish the existence of federal subject matter jurisdiction.  *In re Bus. Men's Assur. Co. of Am.*, 992 F.2d 181, 183 (8th Cir. 1993).  If a case does not present a federal question and is not removable based on diversity of citizenship and the amount in controversy, then it must be remanded to state court.  The court must resolve any doubts about federal jurisdiction in favor of remand.  *Id.*

### b.  Discussion

ERISA explicitly preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title."  29 U.S.C. § 1144(a).  A benefit plan under Section 1003(a) is one maintained "by any employer engaged in commerce or in any industry or activity affecting commerce" or "by any employee organization or organizations representing employees engaged in commerce or in any industry or activity affecting commerce."  *Id.* at § 1003(a)(1)-(2).

It is well established that ERISA preempts common law causes of action for breach of contract if they "relate to" an ERISA plan.  *See, e.g., Metro. Life Ins. Co. v. Taylor,* 481 U.S. 58, 60 (1987); *Johnson v. U.S. Bancorp*, 387 F.3d 939, 942 (8th Cir. 2004).  The effect of this preemption may be to deny claims under applicable state law while at the same time affording no remedy under ERISA.  *See, e.g., Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 148 (1985).  Plaintiffs argue, however, that ERISA preemption does not apply in this case because (1) interpreting ERISA to preempt plaintiffs' claim would impair another federal statute in violation of ERISA's savings clause and (2) plaintiffs' claim does not "relate to" an ERISA plan for purposes of preemption.  The court addresses each of these arguments.

### i.  ERISA's Savings Clause Does Not Save this Claim

ERISA's savings clause provides that "[n]othing in this subchapter shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United

States . . . or any rule or regulation issued under any such law."  29 U.S.C. § 1144(d).  In determining whether a construction of ERISA "impairs" the operation of another federal statute, the question is whether that construction would "frustrate the goal" of the second statute.  *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 102 (1983).

Plaintiffs argue that were ERISA preemption to apply in this case, it would frustrate the goals of the Fitzgerald Act of 1937, 29 U.S.C. § 50.  The Fitzgerald Act authorizes the U.S. Secretary of Labor "to formulate and promote the furtherance of labor standards necessary to safeguard the welfare of apprentices" in cooperation with state agencies engaged in the same type of work.  *Minn. Chapter of Assoc. Builders & Contractors v. Minn. Dep't of Labor and Indus.*, 47 F.3d 975, 981 (8th Cir. 1995) (citing 29 U.S.C. § 50).

The Fitzgerald Act is administered by the Department of Labor, which has issued the following relevant regulations pursuant to that Act:

> An apprenticeship program, to be eligible for approval and registration by a Registration Agency, must conform to the following standards:
>
> (a) The program must have an organized, written plan (program standards) embodying the terms and conditions of employment, training, and supervision of one or more apprentices in an apprenticeship occupation, as defined in this part, and subscribed to by a sponsor who has undertaken to carry out the apprentice training program.
>
> (b) The program standards must contain provisions that address:
>
> \*\*\*
>
> (19) Provision for registration of apprenticeship agreements, modifications, and amendments; notice to the Registration Agency of persons who have successfully completed apprenticeship programs; and notice of transfers, suspensions, and cancellations of apprenticeship agreements and a statement of the reasons therefore.

29 C.F.R. § 29.5.

Plaintiffs assert that the scholarship loan agreements were made pursuant to JATC's written program standards, which were submitted and approved by the Department of Labor under the Fitzgerald Act.  The Fitzgerald Act's aim is to safeguard

7

the welfare of apprentices by promoting national apprenticeship program standards. Allowing the loan agreements to become unenforceable via ERISA preemption, plaintiffs argue, would defeat the purpose of the Act.   In support of their claim, plaintiffs specifically point to 29 C.F.R. § 29.5(b)(19), which requires apprenticeship programs to have a written standard for the cancellation of apprenticeship agreements.   But this provision only requires a written standard for the *notice* of such cancellations, and it does not, in any case, dictate what the standard for cancellation must be.   This court is unable to conclude that the Department of Labor's implementation of the Fitzgerald Act would be impaired by ERISA preemption in this case.   Nor has it been able to discover any other court's conclusion that a breach of contract claim was saved from preemption because it was also related to an apprenticeship program registered under the Fitzgerald Act.

The cases on which plaintiffs rely do not provide this support.   Those cases are concerned with the express preemption of state statutes regulating apprenticeship wages, not the complete preemption of a breach of contract claim as argued by defendant Weddle.  *See Cal. Div. of Labor Stds. Enforcement v. Dillingham Constr. N.A.*, 519 U.S. 316, 330 (1997); *Minnesota Chapter of Associated Builders & Contractors v. Minnesota Dep't of Labor and Indus.*, 47 F.3d at 981.

First, in *Minnesota Chapter*, the Eighth Circuit analyzed whether ERISA expressly preempted Minnesota's prevailing wage law, which provided an exemption for any apprenticeship program that had received state or federal approval.   47 F.3d at 980-81. The Eighth Circuit held that the state statute was saved by ERISA's savings clause because the "federal approval" to which the state statute referred would be administered by the Bureau of Apprenticeship and Training (Bureau) under the Fitzgerald Act.  *Id.* Thus, Minnesota's law was specifically authorized by the Fitzgerald Act and its accompanying regulations.  *Id.*  Express preemption of the Minnesota law would directly interfere with the Fitzgerald Act's primary purpose: approval of apprenticeship programs. Here, defendant Weddle is not arguing that ERISA expressly preempts the Missouri state common law cause of action for breach of contract.   Instead, he argues that plaintiffs'

8

specific claim is completely preempted by ERISA and converted from a state law claim to an ERISA claim.   Further, while the scholarship loan agreements at issue are referenced in the written standards plaintiffs submitted to the Bureau for approval, the specific agreements at issue in this dispute do not in any way depend on the administration of the Fitzgerald Act.   Just because the Bureau approved those written standards does not mean the loan agreements are thereby implementations of the Fitzgerald Act.   The court does not conclude that preemption of plaintiffs' claim would frustrate the goals of the Fitzgerald Act, which are essentially to induce apprenticeship programs to register at the state or federal level and thereby promote the welfare of apprentices.  *See, e.g., Minnesota Chapter*, 47 F.3d at 980-81.

In the second case plaintiffs cite, *Dillingham*, the Supreme Court footnoted that, while preemption was "not inconceivable," ERISA's silence about preemption of specific state law programs fostered by preexisting federal statutes, *e.g.* the  Fitzgerald Act, "counseled against" preemption of California's prevailing wage statute.  519 U.S. at 332 n.7.  But it ultimately concluded that the state statute was not preempted, because it did not "dictate the choices" facing ERISA plans, it merely "alter[ed] the incentives."  519 U.S. at 334.  In the case at bar, the argued conflict between ERISA and the Fitzgerald Act is even more remote; plaintiffs have not demonstrated how the Fitzgerald Act's mandate for standards has in any way dictated how they implemented the apprentice scholarship loan agreements.

In other words, just because the Fitzgerald Act establishes that apprenticeship programs must have standards related to specific topics, without dictating what those standards must be, does not make it inconsistent with the plaintiffs' administration of an ERISA plan.  Neither the Fitzgerald Act nor its implementing regulations contemplate enforcement mechanisms.  *See Hydrostorage, Inc. v. N. Cal. Boilermakers Local Joint Apprenticeship Comm.,* 891 F.2d 719 (9th Cir. 1989), *abrogated on other grounds by Indep. Training & Apprenticeship Program v. Cal. Dep't of Indus. Relations*, 730 F.3d 1024 (9th Cir. 2013).   Instead, the Fitzgerald Act authorizes the registration of

apprenticeship programs and conditions this registration on a program's conformity with national apprenticeship program standards.  *See id.*; 29 C.F.R. § 29.3.

The court has reviewed the standards promulgated by the Secretary of Labor under the Fitzgerald Act but can find no standard that would be impaired by ERISA preemption in this case.  29 C.F.R. § 29.1-29.13.  The closest provision is found in Section 29.7, which requires an apprenticeship agreement to contain "a statement of . . . whether or not the required related instruction is compensated."  *Id.* at § 29.7(g).  ERISA preemption of plaintiffs' breach of contract claim would not impair the operation of this provision.

Any authority the court has found for the Fitzgerald Act's saving power is limited to the context of state regulation of apprenticeship programs.  *See id.*  The present dispute arises out of a wholly separate context: an individual claim related to an apprentice's scholarship loan agreement.  While the underlying apprenticeship program happens to be governed to some extent by the Fitzgerald Act, as well as ERISA, the instant breach of contract claim is not saved on that ground.  The two federal statutory schemes do not conflict in this case but are complementary.

ii.  Plaintiffs' Claim Does Not Relate To
An ERISA Plan and Is Therefore Not Preempted

In *Aetna Health Inc. v. Davila*, the Supreme Court held that ERISA completely preempts a claim when (1) the claim could have been brought, at some point in time, under ERISA and (2) the claim is dependent on an ERISA plan or duty and does not involve the violation of any independent legal duty.  542 U.S. 200, 208-10 (2004).  Plaintiffs contend that their cause of action is not preempted by ERISA because it fails the second prong of the *Davila* test, in that "there is no plan in this case on which the claim could be based."  (ECF No. 18 at 11).  They advance three arguments to support this proposition.  First, programs exclusively providing apprenticeship training benefits are exempted from having employee welfare benefit plans.  (*Id.*) ("DOL regulations exempt training funds from having a plan of benefits and, accordingly, neither Plaintiffs have such a plan").  Second, the scholarship loan agreements are standalone contracts

10

based on an independent contractual duty, not an ERISA plan.  (*See id.*; ECF No. 20 at 3 ("[Weddle's] legal duty does not arise under any plan term, but under the scholarship loan agreements, which are part of the Joint Committee's standards approved by the United States Department of Labor pursuant to the Fitzgerald Act."); ECF No. 24 oral argument).  And, third, the scholarship benefits are funded out of general assets and not an ERISA fund.  (ECF No. 24 oral argument).

Plaintiffs first argue that 29 C.F.R. § 2520.104-22 exempts apprenticeship training funds from having ERISA plans of benefits.  But this regulation only exempts apprenticeship training benefit plans from ERISA's requirement that benefit plans be formally written.  29 C.F.R. § 2520.104-22.  This regulation provides only that the documents collectively representing the apprenticeship fund need not be formally reported and disclosed as such.  *See id.*; *Milwaukee Area Joint Apprenticeship Training Comm. for Elec. Indus. v. Howell*, 67 F.3d 1333, 1338 (7th Cir. 1995).  The regulation implicitly recognizes that a fund that provides apprenticeship training benefits can be an employee welfare benefit plan; it simply relaxes the general reporting and disclosure requirements for such a plan.  29 C.F.R. § 2520.104-22(a).  This exemption does not establish that the apprenticeship program is not an ERISA plan.

Plaintiffs further argue that the scholarship loan agreements are not part of an employee welfare benefit plan under ERISA, but rather are standalone contracts made pursuant to JATC's "standards" approved by the Department of Labor under the Fitzgerald Act.  Plaintiffs argue that the loan agreements require no reference to, or interpretation of, other documents.[1]  Defendant responds, however, that the

---

[1] The case to which plaintiffs cite in support of this proposition, *Urista v. Ohman*, is not instructive.  2012 Minn. Dist. LEXIS 233 (Minn. 1st Jud. Dist., Nov. 19, 2012); (ECF No. 18, Ex. 1, at 6, 8).  In that case, an apprentice had promised to repay the value of scholarship loan amounts to a union in promissory notes that did not notify the apprentice of the training or benefits he was entitled to under the benefit plan.  *Urista*, 2012 Minn. LEXIS 233 at *16-17.  The Minnesota trial court held that the scholarship loan agreements were part of the benefit plan but distinguished the notes from the loan agreements, construing them as an independent basis for a breach of contract claim.  *Id.* at *16-17, *23-24.  However, in a later section of the case opinion, the court made a

apprenticeship program is a welfare benefit plan and the loan agreements are an integral part of that plan.

Under ERISA, an "employee welfare benefit plan" includes, among other things, "apprenticeship or other training programs" and "scholarship funds."   29 U.S.C. § 1002(1)(A); 29 C.F.R. § 2510.3-1(a)(2).   While plaintiffs plainly administer an apprenticeship and scholarship program, the court turns to plaintiffs' third argument about the funding for these programs to determine whether they are ERISA benefit plans.

The Supreme Court has noted that it is the existence of a separate fund that triggers ERISA coverage.  *California Div. of Labor Standards Enf't v. Dillingham Const., N.A., Inc.*, 519 U.S. at 327.  If a program that administers benefits is not supported by monies placed into a separate fund, it is not considered an ERISA benefit program.  *Id.* This is apparent in the regulations: scholarship programs paid for out of an employer's or an employee organization's general assets are not ERISA plans, 29 C.F.R. § 2510.3-1(k), and on-the-job training funded by general assets does not constitute an ERISA plan.  29 C.F.R. § 2510.3-1(b)(3)(iv).  *See also Dillingham*, 519 U.S. at 327.

Based on the evidence presented to the court, JATC's apprenticeship program is an ERISA plan, not an unfunded scholarship program nor a qualified on-the-job training program.  The Department of Labor considered an analogous program to be an ERISA plan in a 1994 advisory opinion: in that matter, a Joint Apprenticeship Trust (JAT) had been established under collective bargaining agreements, provided apprenticeship training and work in the insulation industry, and paid these benefits out of assets derived exclusively from employer contributions.  ERISA Advisory Op. No. 94-14A (1994).[2] The opinion held that because the JAT provided benefits in the form of apprenticeship or training and the benefits were not paid from the general assets of an employer or employee organization, the JAT was an employee welfare benefit plan under ERISA.  *Id.*

_____

contrary holding: that the notes were derived entirely from the scholarship loan agreements, which it had found to be part of the benefit plan. *Id.* at *23-24.

[2]   Available   at   https://www.dol.gov/agencies/ebsa/employers-and-advisers/guidance/ advisory-opinions/1994-14a  (last accessed Oct. 26, 2016).

So here, the benefits paid under the JATC's program are not paid from the general assets of an employer or an employee organization; rather they are funded by the SMART Local Fund and ITI.  Indeed, as a joint apprenticeship committee, JATC is required under the Labor Management Relations Act to defray its apprenticeship and training expenses with money placed in a separate fund.  29 U.S.C. § 186(c)(6).  Accordingly, the program is an ERISA plan. *See Dillingham*, 519 U.S. at 326.

Now the court must determine whether the scholarship loan agreements are part of or related to the apprenticeship program such that ERISA preemption applies.  On the one hand, as defendant argues, JATC's standards detail the terms of the ERISA apprenticeship program and reference the scholarship loan agreements as part of that program.  Additionally, signing the loan agreements is required to participate in the ERISA plan, and the loan agreements notify the apprentice of his or her benefits under the ERISA plan.  On the other hand, these agreements are, as plaintiffs argue, standalone contracts between an employer and a single apprentice, and they do not fall within the ambit of Congress' intention in enacting the ERISA framework.

The Supreme Court's jurisprudence on whether a claim "relates to" an ERISA plan was originally very broad.  *See, e.g., Shaw v. Delta Air Lines, Inc.,* 463 U.S. at 97.  But recent decisions have retreated from this expansive interpretation.  *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654-58 (1995).  The Court has explained that "[i]f 'relate to' were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes preemption would never run its course, for really, universally, relations stop nowhere." *Id.* at 655.  Instead, courts are to look to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive. *Id.*

The Supreme Court has discerned that "Congress' primary concern [in enacting ERISA] was with the mismanagement of funds accumulated to finance employee benefits and the failure to pay employees benefits from accumulated funds."  *Massachusetts v. Morash,* 490 U.S. 107, 115 (1989).  ERISA established extensive disclosure, reporting, and fiduciary duty requirements to protect employees from poor plan management. *Id.*

13

Additionally, "One of the principal goals of ERISA is to enable employers 'to establish a uniform administrative scheme, which provides a set of standard procedures to guide processing of claims and disbursement of benefits.'" *Egelhoff v. Egelhoff ex rel. Breiner,* 532 U.S. 141, 148 (2001) (citation omitted).  As the Court held in *Travelers*, the "basic thrust" of ERISA's preemption clause is to avoid conflicting state and local regulation in calculating and administering employee benefits.  *Travelers Ins. Co.*, 514 U.S. at 657.

Finally, although the Court has formulated the *Davila* test for determining whether a claim relates to an ERISA plan such that it is completely preempted, neither of the post-*Davila* Supreme Court cases addressing ERISA preemption cites to *Davila* nor employs its test, indicating that *Davila* supplements rather than supplants *Travelers*.  *See Gobeille v. Liberty Mut. Ins. Co.*, 136 S. Ct. 936 (2016); *Kennedy v. Plan Administrator for DuPont Savings and Investment Plan,* 555 U.S. 285 (2009).  Ultimately, it appears that a court should use ERISA objectives as a guide to determine whether a state-law claim is preempted.

Accordingly, while the scholarship loan agreements at issue here might have been made to facilitate participation in an ERISA plan, the court must determine whether they "relate to" the plan such that they fall within the scope of state law that Congress understood would survive.  When considering the Supreme Court's entire preemption jurisprudence, plaintiffs' claim does not appear to fall within the scope of congressional preemption intent.  ERISA jurisprudence is not well-settled, is conflicting, and is generally complex, but the Supreme Court's ERISA preemption cases consistently reason that Congress intended ERISA to preempt state laws and causes of action that substantially affect the determination and administration of benefits under an employee benefit plan.  *See, e.g., Gobeille v. Liberty Mut. Ins. Co.*, 136 S. Ct. 936, 943 (2016) (finding preemption when state statute required reporting detailed information about benefit administration); *DeBuono v. NYSA-ILA Medical and Clinical Services Fund*, 520 U.S. 806, 814-15 (1997) (finding no preemption when the state law did not interfere with the calculation of benefits); *Dillingham*, 519 U.S. at 334 (finding no preemption when the

14

state law altered incentives but did not dictate the choices facing ERISA plans); *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 524 (1981) (finding preemption when state statute regulated calculation of pension benefits).

The scholarship loan agreements at issue here memorialize the parties' understanding that plaintiffs would distribute certain benefits to defendant and, if defendant did not meet certain obligations, he would need to repay to plaintiffs the value of the benefits distributed to him. Essentially, then, these agreements do not concern the distribution of benefits, but rather the post-administration liability of defendant should he not meet certain obligations.

The Supreme Court has left the question of post-administration preemption open, that is, whether ERISA preempts actions related to plan benefits after the benefits have been distributed. *Kennedy v. Plan Administrator for DuPont Savings and Investment Plan,* 555 U.S. 285, 299 n. 10 (2009) ("Nor do we express any view as to whether the Estate could have brought an action in state or federal court against [the beneficiary] to obtain the benefits after they were distributed."). But the Third Circuit recently considered whether ERISA preempted a waiver provision in a property settlement agreement after the plan proceeds had been distributed. *Estate of Kensinger v. URL Pharma, Inc.*, 674 F.3d 131, 134 (3d Cir. 2012). That court held that "permitting suits against beneficiaries *after* benefits have been paid does not implicate any concern of expeditious payment or undermine any core objective of ERISA." *Id.* at 137 (emphasis in original).

Additionally, in an analogous, post-*Davila* case, the Ninth Circuit held that an ERISA fiduciary could bring a state law breach of contract action against a double-collecting beneficiary. *Providence Health Plan v. McDowell*, 385 F.3d 1168, 1172 (9th Cir. 2004), cert denied, 544 U.S. 961 (2005). The *McDowell* court reasoned that "because this is merely a claim for reimbursement based upon the third-party settlement, it does not 'relate to' the plan." *Id.* It held that the ERISA plan insurer was "simply attempting, through contract law, to enforce the reimbursement provision." *Id.* The claim was not preempted because its adjudication "[did] not require interpreting the plan

15

or dictat[ing] any sort of distribution of benefits."  The ERISA plan insurer had already paid ERISA benefits on behalf of the beneficiaries and the correctness of the benefits paid was not in dispute.  *Id.*

This court finds the reasoning of the Third and Ninth Circuits persuasive.  At bottom, ERISA is concerned with the calculation and administration of ERISA benefits. Its objective is to ensure that benefits promised to beneficiaries are actually received. Once these benefits have been received by the beneficiary, the calculation and administration of benefits is complete.  A subsequent dispute between the fiduciary and the beneficiary, while related to the agreement, is unrelated to benefit calculation or administration.  Therefore, the parties' dispute over repayment under state law is not preempted.

Moreover, the scholarship loan agreements are individualized agreements between plaintiffs and defendant.  The Eighth Circuit has noted in the context of severance benefits that "arrangements that involve a single employee require particularly careful scrutiny." *Dakota, Minnesota & E. R.R. Corp. v. Schieffer*, 648 F.3d 935, 936–38 (8th Cir. 2011) (quoting *Cvelbar v. CBI Illinois Inc.*, 106 F.3d 1368, 1376 (7th Cir. 1997).  As the *Schieffer* court noted:

> Congress in the National Labor Relations Act broadly preempted state laws that interfere with multi-employee collective bargaining, and in ERISA broadly preempted state laws that interfere with multi-employee benefit plans.  But Congress has never preempted state laws that regulate and enforce individual employment contracts between employers and their executives.  That remains an important prerogative of the States, no matter how complex a contract may be to administer. Neither the administrative nor the remedial purposes of ERISA preemption apply to the resolution of contractual disputes between an employer and a single, salaried employee.

*Schieffer*, 648 F.3d at 938.

Unlike *Davila*, in which beneficiaries sought to use state-law claims to enforce promises for benefits, here defendant Weddle has already received the promised benefits. Plaintiffs are seeking to recover the value of those benefits after an alleged breach of the contract between them and defendant Weddle, an individual apprentice.  This claim does

not fall within the scope of ERISA.  To hold otherwise would shield the beneficiary from obligations he freely undertook.  None of the objectives of ERISA are implicated in this claim.  This claim does not dispute the terms and conditions of the ERISA plan, the level of benefits owed, or the method used to calculate benefits.  Resolution of plaintiffs' claim will not undermine regulatory uniformity in the field of employee benefit plan regulation or the policy concerns with ensuring that employees receive plan benefits. Therefore, it does not "relate to" any ERISA plan at issue; it merely seeks to enforce a post-administration contractual provision.

Furthermore, under the *Davila* test, plaintiffs could not have brought their breach of contract claim for monetary damages under ERISA, which only provides that fiduciaries can enforce the terms of a welfare benefit plan through equitable jurisprudence.  29 U.S.C. § 1132(a)(3); *see also Mertens v. Hewitt Associates*, 508 U.S. 248, 256-57 (1993).  Several courts have held that this breach of contract claim is not available under ERISA.  *See, e.g., Honolulu Joint Apprenticeship & Training Center Comm. Of United Ass'n Local Union No. 675 v. Foster*, 332 F.3d 1234 (9th Cir. 2003) (holding that the enforcement of a scholarship loan agreement was not equitable relief available under ERISA); *Sheet Metal Local No. 24 Anderson v. Newman*, 35 Fed. Appx. 204 (6th Cir. 2002) (same).

For these reasons, plaintiffs' breach of contract claim is not preempted by ERISA.  This claim is not otherwise argued to present a question of federal law under 28 U.S.C. § 1331.   Because the amount in controversy is not alleged to exceed $75,000.00, and the parties are not diverse in citizenship (ECF No. 1, Ex. 1), this court does not have subject matter jurisdiction over the claim under 28 U.S.C. § 1332.

Accordingly, because this court does not have subject matter jurisdiction over plaintiffs' claim, the case must be remanded to state court.  28 U.S.C. § 1447(c).

### c.  Attorneys Fees

Pursuant to 28 U.S.C. § 1447(c), plaintiffs included a motion for attorney fees in their motion to remand.  A court may award attorneys fees under this provision, if the

removing party lacked an objectively reasonable basis for removal. *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 141 (2005). ERISA's remedial scheme is sufficiently complex, *DiFelice v. Aetna U.S. Healthcare,* 346 F.3d 442, 454 & n. 1 (3d Cir. 2003) (described as a "Serbonian bog) (Becker, J., concurring), to allow defendant an objectively reasonable basis for removing plaintiffs' claim to this court. Therefore, plaintiffs' request for attorneys' fees is denied.

## ORDER OF REMAND

For the reasons set forth above,

**IT IS HEREBY ORDERED** that the motion of plaintiffs to remand this action to the Circuit Court of the City of St. Louis (ECF No. 17) is **SUSTAINED.** This action is hereby remanded to that court for all further proceedings. The pending motion of defendant to dismiss for failure to state a claim (ECF No. 8) is deferred to the state court.

/S/ David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on November 1, 2016.